Deere & Company vs. James A. Ford, Jr., & another.[1]

Middlesex. April 5, 2001. - May 23, 2001.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Cordy, JJ.

*Motor Vehicle,* Dealer. *Statute,* Construction. *Words,* "Motor vehicle."

Discussion of G. L. c. 93B, which regulates all written or oral agreements between motor vehicle manufacturers, wholesalers, distributors, and dealers, and the definition of the term "[m]otor vehicle" as used therein and as defined by G. L. c. 90, § 1, and by the holding in *Hein-Werner Corp.* v. *Jackson Indus., Inc.,* 364 Mass. 523 (1974). [227-228]
This court concluded that G. L. c. 93B, which regulates business practices between motor vehicle manufacturers, distributors, and dealers, did not apply to agreements between two parties involving the sale of lawn care and ground maintenance equipment, where such equipment did not constitute "[m]otor vehicle[s]" within the meaning of the statute, that is, vehicles designed for regular use in the transportation of persons and property on the traveled part of public highways. [228-232]

Civil action commenced in the Superior Court Department on August 13, 1996.

A motion for summary judgment was heard by *Martha B. Sosman,* J., and questions of law were reported by her to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Thomas S. Vangel (Michael P. Connolly* with him) for the plaintiff.

*J. Kenneth Griffin* for the defendants.

Greaney, J. A judge in the Superior Court reported to the Appeals Court three questions of law after she denied part of a motion for summary judgment filed by the plaintiff, Deere & Company (Deere). See G. L. c. 231, § 111; Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996). The dispositive question is whether G. L. c. 93B, entitled "Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors

[1]His wife, Aurora A. Ford.

and Dealers," applies to the business operations of the defendant James A. Ford, Jr. (Ford). Those business operations involve the sales of two lines of products furnished by Deere to Ford that consist, for the most part, of lawn care and ground maintenance equipment. We conclude that G. L. c. 93B is not applicable to Ford's business operations arising out of his agreements with Deere, and consequently, answer the dispositive question, "No."

The background of the case is as follows. Deere is in the business of manufacturing lawn, garden, and ground maintenance equipment for both residential and commercial use. In 1992, Ford (doing business under the names of Sanda Equipment Corporation and Sanda Equipment Sales), negotiated with Deere to open a Deere dealership in Wilmington. The parties executed two agreements, one that authorized Ford to sell Deere's lawn and garden line of products (Lawn and Garden Dealer Agreement), and another that authorized him to sell Deere's commercial product line (Commercial Products Dealer Agreement). (We shall refer to both agreements as "dealer agreements.") Under the dealer agreements, Deere was to provide its products to Ford on credit, and Ford was to pay for Deere's services and promotion. Ford and his wife, Aurora A. Ford, signed personal guaranties of the dealership's obligations. (Aurora Ford is a defendant by reason of her guaranty).

The product line available to Ford under the Lawn and Garden Dealer Agreement consisted of trimmers, brush cutters, chippers, hedge clippers, leaf shredders, lawnmowers, edgers, snowblowers, and lawn and garden tractors. None of the tractors or lawnmowers was capable of speeds in excess of twelve miles an hour. The product line available to Ford under the Commercial Products Dealer Agreement consisted of mowers, utility tractors, utility vehicles, and skid steer loaders. Of these products, four tractor models and two utility vehicle models were capable of speeds in excess of twelve miles an hour (the maximum speed being 15.6 miles an hour). Deere did not file a copy of either dealer agreement with the Attorney General as called for by G. L. c. 93B, for agreements covered by the statute.

By August, 1993, Ford was in arrears on his payments to Deere, and, in early 1994, Deere placed him on credit restriction. In the fall of 1994, Ford was the successful bidder on a contract

to lease Deere equipment to the city of Lowell. Under the dealer agreements, the usual form used to complete the transaction would have been a leasing arrangement in which Deere Credit, Inc., would purchase the equipment and then lease it to the customer. Lowell would not accept such an arrangement. In spite of the credit restriction that had been placed on Ford's dealership, Deere agreed to finance the transaction. In return, Ford gave Deere a promissory note, accompanied by a security agreement, the terms of which differed from the terms of the dealer agreements. Included in the equipment leased to Lowell were two Deere tractors, which the city registered with the Registry of Motor Vehicles.

In August, 1996, Ford was still in arrears on both the amounts owed under the dealer agreements and the amounts owed under the equipment loan for the Lowell transaction. Deere subsequently terminated the dealer agreements and, pursuant to an order entered by a judge in the Superior Court, repossessed certain equipment from Ford's dealership.

Deere sued to recover money owed on the dealer agreements and on the promissory note for the equipment loan. Deere also invoked the defendants' personal guaranties. The defendants asserted that the dealer agreements, note, and guaranties were unenforceable under G. L. c. 93B, and they filed counterclaims against Deere for alleged violations of the statute. Deere moved for summary judgment on its claims, and in its favor on the defendants' counterclaims, on the ground that G. L. c. 93B did not govern the parties' relationship. The judge denied Deere's motion for summary judgment on all of its claims and on the defendants' G. L. c. 93B counterclaims.[2]

The judge, in her memorandum of decision, reasoned that, although G. L. c. 93B was enacted to remedy specific abuses in the automotive industry, the statute's broad definitions appeared to extend its reach to other types of dealerships, if the dealerships involved the sale of "motor vehicles." See G. L. c. 93B, § 2. Critical to the applicability of G. L. c. 93B, the judge

---

[2]The defendants also asserted counterclaims alleging misrepresentation, invasion of privacy, interference with contractual relations, breach of contract, and violations of G. L. c. 93A. The judge granted summary judgment as to these claims in Deere's favor.

determined, is the statute's definition of "motor vehicle."[3] The judge recognized that this court, in *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523 (1974) (*Hein-Werner*), had broadly interpreted G. L. c. 93B to regulate transactions by any party whose contract with a supplier gave it the "power to accept orders" for vehicles that constitute "motor vehicles" under G. L. c. 90, § 1,[4] without regard to whether the vehicles were to be used in a way that would require their registration under G. L. c. 90, § 9 (that is, to be operated on a public "way"[5] ). The decision in *Hein-Werner, supra*, according to the judge, compelled a legal conclusion that "motor vehicles" under G. L. c. 93B included all vehicles capable of speeds in excess of twelve miles an hour, and, because six models of Deere vehicles available through the dealer agreements had that capability, they were "motor vehicles" for purposes of G. L. c. 93B (even though most of them will never be used in a fashion that would trigger any requirement that they be registered).

The judge determined, therefore, that the statutory requirements of G. L. c. 93B applied to the dealer agreements between Deere and Ford, and Deere's failure to file the agreements with the Attorney General, as required by G. L. c. 93B, § 8, rendered them null and void under G. L. c. 93B, § 13. The judge concluded that, in the absence of a valid contract, Deere could not pursue its contract claims against the defendants, but that the defendants could assert claims against Deere for violations

---

[3]The statute defines "[m]otor vehicle" as "any motor driven vehicle required to be registered under chapter ninety." G. L. c. 93B, § 1 (*a*).

[4]General Laws c. 90, § 1, defines "[m]otor vehicles," in relevant part, as follows:

> "[A]ll vehicles constructed and designed for propulsion by power other than muscular power . . . except . . . vehicles used for other purposes than the transportation of property and incapable of being driven at a speed exceeding twelve miles per hour and which are used exclusively for the building, repair and maintenance of highways or designed especially for use elsewhere than on the travelled part of ways."

The definition also includes certain other exceptions that are not relevant to this appeal.

[5]Chapter 90, § 1, defines a "[w]ay" to be "any public highway, private way laid out under authority of statute, way dedicated to public use, or way under the control of park commissioners or body having like powers."

of G. L. c. 93B. The judge summarized the predicament facing her in these words: "As implausible as it seems that a manufacturer and dealer in such things as leaf shredders, trimmers, lawn mowers and snowblowers would have their relationship governed by a law designed for the specific problems in the automobile industry, the statute has been interpreted by the Supreme Judicial Court [in *Hein-Werner*] in a fashion that leaves this court with no choice but to apply G. L. c. 93B to the [a]greements in this case."

The judge granted Deere leave to amend its complaint to plead claims based on quantum meruit to recover for the products and services provided to Ford. Recognizing that the need for, and content of, any trial rested principally on the decision that G. L. c. 93B applied,[6] the judge sought a definitive appellate ruling on the applicability of G. L. c. 93B. We granted Deere's application for direct appellate review.[7]

1. General Laws c. 93B applies broadly to business practices concerning "motor vehicle[s]," G. L. c. 93B, § 2, and regulates "all written or oral agreements between a manufacturer, wholesaler or distributor with a motor vehicle dealer." G. L. c. 93B, § 8. The statute defines a "[m]anufacturer" as "any person engaged in the business of manufacturing or assembling new and unused motor vehicles"; a "[m]otor vehicle dealer" as "any person who, in the ordinary course of business, is engaged in the business of selling new or used motor vehicles to consumers or other end users"; and a "[d]istributor" as "any person who sells or distributes new or used motor vehicles to motor

---

[6]The judge determined that, if G. L. c. 93B is not applicable, Deere would be entitled to summary judgment on its contract claims (needing only an assessment of damages based on a calculation of the amounts still owing), as well as summary judgment in its favor on all of the defendants' counterclaims alleging violation of G. L. c. 93B. The disallowance of the G. L. c. 93B counterclaims, however, would resurrect the defendants' counterclaims of breach of contract and violations of G. L. c. 93A.

[7]In addition to the question of the applicability of G. L. c. 93B, the judge also reported the following subsidiary questions, to be considered in the event that G. L. c. 93B was determined to govern the parties' relationship: (1) whether Deere may pursue the alternative remedy of quantum meruit; (2) whether G. L. c. 93B renders the defendants' personal guaranties unenforceable; (3) whether G. L. c. 93B renders the promissory note for the equipment loan unenforceable. In view of our conclusion that G. L. c. 93B does not apply, we need not address these subsidiary questions.

vehicle dealers." G. L. c. 93B, § 1 (b), (g), and (h). As the judge correctly observed, the term "motor vehicle" is the key to the statute, and the critical factor in its applicability to this case is whether the business relationship between Deere and Ford involved the sale of "motor vehicles."

The statute defines "[m]otor vehicle," somewhat ambiguously, as "any motor driven vehicle required to be registered under chapter ninety." G. L. c. 93B, § 1 (a). The ambiguity stems from the fact that G. L. c. 90 requires, with certain exceptions,[8] the registration of any motor vehicle that is "operated, pushed, drawn or towed upon or [permitted] to remain upon any way." G. L. c. 90, § 9. "No motor vehicles are required by the terms of c. 90 to be registered simply by virtue of their status as such. Instead, c. 90 prohibits certain uses unless the motor vehicle is registered. From this it can be argued that there are no 'motor vehicles' within the meaning of c. 93B. It would follow from this that there are no 'manufacturers' or 'motor vehicle dealers' within the meaning of c. 93B, §§ 1 (b) and 1 (h), respectively. Such a construction would effectively nullify the entire chapter and thus is not to be favored." *Hein-Werner*, *supra* at 526-527, and cases cited. In order to provide a workable definition of the term "motor vehicle" as used in G. L. c. 93B, and to avoid a construction (based on a vehicle's possible future use) that could render the statute impractical to administer, the court went on in *Hein-Werner* to hold that "the term 'motor vehicle' as used in [G. L.] c. 93B, § 1 (a), and wherever that term otherwise appear[s] in that chapter, is defined as shown in [G. L.] c. 90, § 1." *Id.* at 528.[9]

The defendants take the definition literally and claim that any

[8]Exceptions to the registration requirement are allowed for (1) out of State vehicles; (2) short distance use of a tractor, trailer, or truck used exclusively for agricultural purposes; (3) short distance use of a tractor, trailer or truck used for industrial purposes between two properties of the vehicle's owner; (4) unloading and short distance delivery to a dealer; (5) golf carts used solely for the purpose of traveling between parts of a golf course property; (6) short distance use of motor vehicles owned by a cemetery; and (7) certain short distance uses of earth-moving vehicles. See G. L. c. 90, §§ 3 and 9.

[9]We reject Deere's argument that this court's interpretation of the definition of "motor vehicle" in G. L. c. 93B, as set forth in *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523, 528 (1974), was dictum. This court made abundantly clear its intent to establish a clear standard to be applied by future

motor driven vehicle that is capable of traveling over twelve miles an hour, no matter how used, is a "motor vehicle" under G. L. c. 93B. They conclude that, because the dealer agreements authorized Ford to sell models of Deere tractors and utility vehicles that could achieve speeds in excess of twelve miles an hour, the vehicles constitute "motor vehicles" under G. L. c. 93B, § 1, and the dealer agreements, and the debt instruments, evidenced by the promissory note and the guaranties, fall within the ambit of G. L. c. 93B. We disagree.

The Legislature never intended the applicability of G. L. c. 93B to hinge on the ability of a vehicle or vehicles to travel in excess of twelve miles an hour. The *Hein-Werner* case acknowledged as much. While recognizing that its interpretation of "motor vehicles" could extend the coverage of G. L. c. 93B beyond the common understanding of the word "automobiles," the court stressed that the statute's applicability should be limited to "the common usage of that term [motor vehicles]." *Id.* at 529. Thus, the court stated that, "[b]eyond doubt, [the] definition [adopted in the decision] includes only the vehicles which are designed for regular use in the transportation of persons and property on the traveled part of public highways." *Id.*[10] See *Arbella Mut. Ins. Co.* v. *Vynorious,* 34 Mass. App. Ct. 121, 124 (1993) ("Snowmobiles, being vehicles not designed for regular use on public highways, do not fall within that definition [of 'motor vehicles' found in G. L. c. 90, § 1]").[11]

The court's observation in *Hein-Werner, supra* at 529, limit-

courts interpreting G. L. c. 93 by stating: "In so holding, we adopt the clarity and precision of a standard already in operational administrative use. It is fair to infer that the Legislature intended to be definite and precise rather than to follow the indefiniteness and difficulty of administration inherent in any of the suggested alternative meanings." *Id.*

[10]This is not to say that remarkable feats cannot be accomplished, on rare occasions, by quality riding lawnmowers put to atypical use for public transportation. An example occurs in the movie, "The Straight Story," which tells the true story of Alvin Straight, who drove his 1966 John Deere riding lawnmower from Laurens, Iowa, to Mount Zion, Wisconsin (a distance of approximately 300 miles), at an average speed of five miles an hour, to visit, and reconcile with, his ill brother.

[11]Nothing that was said in *Lincoln* v. *Shea,* 361 Mass. 1, 5 (1972), is at variance with this conclusion. In that case, an action for malicious prosecution, this court reasoned that, whether or not a snowplow fell within the definition of "motor vehicle" under G. L. c. 90, a police officer could reason-

ing the application of G. L. c. 93B to motor vehicles as they are commonly understood and used, intuitively tells us that mechanical implements and motorized products intended to care for lawns and yards and to perform landscaping and garden functions are not "motor vehicles . . . designed for regular use in the transportation of persons and property on the traveled part of public highways."[12] That this intuitive conclusion is correct is confirmed by reference to two other sources of clarification that dispel the residual ambiguity that lingers about the scope of G. L. c. 93B. These sources are the legislative background of G. L. c. 93B, and the Legislature's passage in 1996 of G. L. c. 93G, a statute that squarely applies to the types of business arrangements in this case.

The Massachusetts automotive industry was the subject matter of the Report of the Legislative Research Council Relative to Regulation of the Automotive Industry, 1968 Senate Doc. No. 983 (Senate report). Specifically, the council reviewed a bill, 1967 House Doc. No. 2303, which proposed the creation of a board of registration for the licensing of manufacturers, dealers, and repairmen of motor vehicles, to remedy the unfair bargaining position that automobile manufacturers, because of their concentrated economic power, had over local franchised new dealers. In responding to the asserted need for greater regulation of the automotive industry, the Senate report speaks strictly in terms of "automobiles," "car dealers," and "automobile manufacturers and distributers." Although the proposed bill was not enacted, it is clear that G. L. c. 93B,

---

ably have believed that a vehicle "bearing Massachusetts registration plates being driven under its own power along a public way" was a motor vehicle. See *id.* at 4-6 (concluding that the evidence was insufficient to permit a finding, as matter of law, that police officer lacked probable cause to arrest plaintiff for operating motor vehicle after the suspension of his license).

[12]Some of the products sold by Ford ultimately might be used in a fashion that requires their registration under G. L. c. 90, § 9 (as, in fact, was the case with the two tractors leased to Lowell). Certain models of vehicles included in the dealer agreements came equipped with headlights and rear backup lights, and accessory turn signal kits were available for a limited number, which permitted their adaptation for use on public roads. This fact does not affect our conclusion that tractors and utility work vehicles designed for landscaping and garden purposes are not "motor vehicles" within the meaning of G. L. c. 93B, and that the enterprise conducted by Ford was not a business intended to be regulated by G. L. c. 93B.

inserted by St. 1970, c. 814, § 1, codified many of the concerns outlined in the Senate report. See *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319 (1978) (G. L. c. 93B responded to "long-recognized problems including that of the coercion of dealers by automobile manufacturers through such means as the cutting off or purposeful manipulation of the supply of cars"). There is nothing in the report to suggest even remotely that G. L. c. 93B was intended to regulate business relations between a manufacturer of outdoor power equipment, such as Deere, and a dealer in lawn and garden equipment, such as Ford. See Brown, A Bill of Rights for Auto Dealers, 12 B.C. Indus. & Com. L. Rev. 757, 760-776 (1971) (describing specific problems in the automotive industry addressed by G. L. c. 93B, all dealing with potentially oppressive power of automobile manufacturers and distributors in relation to affiliated dealers).

Further, by the enactment of G. L. c. 93G, inserted by St. 1996, c. 265, entitled "Equipment Dealers," the Legislature regulated business relationships between manufacturers and dealers like Deere and Ford. Under G. L. c. 93G, § 1, a "[d]ealer" is defined as a "person, corporation or partnership primarily engaged in the business of retail sales of farm and utility tractors, forestry equipment, light industrial equipment, farm implements, farm machinery, yard and garden equipment, attachments, accessories and repair parts." "Inventory" is defined as "farm, utility, forestry, or light industrial equipment, implements, machinery, yard and garden equipment, attachments or repair parts," and the term describes precisely what Ford was entitled to sell under the dealer agreements.[13] It is evident that, had the Legislature intended that G. L. c. 93B apply to relationships such as the one between Deere and Ford, there would have been no need to enact G. L. c. 93G.[14] See *Habeeb* v. *Retirement Bd. of Quincy*, 389 Mass. 634, 639 (1983), quoting *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 189 (1969) ("An intention to enact a barren and

---

[13]The statute provides, however, that "inventory shall not include heavy construction equipment." G. L. c. 93G, § 1.

[14]The dealer agreements, however, antedating the enactment of G. L. c. 93G by four years, are unaffected by its requirements. See *Hein-Werner, supra* at 525.

ineffective provision is not lightly to be imputed to the Legislature").[15] Conversely, if the Legislature had intended the enactment of G. L. c. 93G to effect a substantive change in the scope and applicability of G. L. c. 93B, it would not have done so without comment.[16] See *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580, 585-586 (1981).

2. The first reported question — whether G. L. c. 93B is applicable to the business arrangements between Deere and the defendants — is answered, "No." In view of this answer, there is no need to answer the other two reported questions. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[15]We reject the defendants' suggestion that G. L. c. 93B and G. L. c. 93G are complementary statutes that provide separate remedies to a dealer, such as Ford, against a manufacturer, such as Deere.

[16]In view of what has been said, it is not unremarkable that case law dealing with G. L. c. 93B has consistently recognized that G. L. c. 93B is a comprehensive statute covering business practices in the *automobile* industry, intended to address the "potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers." *Beard Motors, Inc.* v. *Toyota Motor Distribs., Inc.*, 395 Mass. 428, 430-432 (1985). See *American Honda Motor Co.* v. *Bernardi's Inc.*, 432 Mass. 425, 427 (2000); *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 711 (1979); *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319 (1978). See also *Richard Lundgren, Inc.* v. *American Honda Motor Co.*, 45 Mass. App. Ct. 410, 411 (1998), quoting *Heritage Jeep-Eagle, Inc.* v. *Chrysler Corp.*, 39 Mass. App. Ct. 254, 259 (1995) (G. L. c. 93B "was enacted to protect existing car dealerships in Massachusetts from 'destructive intra-brand competition and the unequal economic power of manufacturers' ").