IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33811-8-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA M. BARNES, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, C. J. —

*Someone says to me: "Shew the children a game." I teach them gaming with dice, and the other says "I didn't mean that sort of game."*
Ludwig Wittgenstein, Aphorism 69 from *Philosophical Investigations* (1953).

Is a riding lawnmower a motor vehicle? We entertain this question in the context of RCW 9A.56.065, the statute that criminalizes the theft of a motor vehicle. After reviewing the purposes behind RCW 9A.56.065, we answer the question in the negative. Those purposes trump the plain meaning of an appurtenant statute defining "motor vehicle." We affirm the trial court's dismissal of charges against Joshua Barnes for theft of a motor vehicle.

## FACTS

We present the facts in a light most favorable to the State of Washington. On June 22, 2015, Joshua Barnes and a female companion, Danielle Goodman, drove, in a white pickup, on to the property of Judy Fraker on Chumstick Highway near lovely Leavenworth. Fraker was then home. Barnes exited the pickup, mounted Fraker's riding lawnmower, and started the mower's motor. The mower was a Craftsman, gas-powered, self-propelled riding lawnmower, with a twenty-six horse power engine. We do not know the value of the lawnmower. We do not know the maximum speed of Fraker's riding lawnmower.

Joshua Barnes drove the lawnmower up a ramp and into the bed of the white pickup. Judy Fraker exited her home and confronted Barnes. Barnes claimed an unidentified person directed him to retrieve the riding lawnmower for "John" at a pumpkin patch. Fraker, unimpressed with the pumpkin patch story, ordered Barnes to remove the lawnmower from the back of the pickup and leave her premises. Barnes obeyed. Two days later, Joshua Barnes admitted to law enforcement that he attempted to steal the riding lawnmower.

## PROCEDURE

The State of Washington, as a result of the June 22 incident, charged Joshua Barnes with theft of a motor vehicle, driving with license suspended in the third degree,

2

and criminal trespass in the second degree. Barnes moved the court to dismiss the allegation of theft of a motor vehicle. Barnes argued the evidence was insufficient as a matter of law to prove the offense because a lawnmower is not a "motor vehicle." The trial court agreed and dismissed the charge of theft of a motor vehicle without prejudice. The State has delayed prosecution of the remaining charges to pursue this appeal.

## LAW AND ANALYSIS

Under Washington law, a defendant may present a pretrial motion to dismiss a charge and challenge the State's ability to prove all of the elements of the crime. *State v. Montano*, 169 Wn.2d 872, 876, 239 P.3d 360 (2010). Judges and lawyers refer to such a motion as a *Knapstad* motion from the leading decision of *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986). The trial court has inherent power to dismiss a charge when the undisputed facts are insufficient to support a finding of guilt. *Knapstad*, 107 Wn.2d at 351. The court must decide whether the facts that the State relies on, as a matter of law, establish a prima facie case of guilt. *Knapstad*, 107 Wn.2d at 356-57. We review de novo a trial court's dismissal of a criminal charge under *Knapstad*. *State v. Conte*, 159 Wn.2d 797, 803, 154 P.3d 194 (2007).

The facts, on which the State relies, include Joshua Barnes taking, without the owner's permission, a powerful, self-propelled riding lawnmower. On these facts we face the legal question of whether the riding lawnmower can constitute a motor vehicle

3

under the statute rendering taking a motor vehicle a crime.

The controlling statute, RCW 9A.56.065, declares in circularity:

> (1) A person is guilty of theft of a motor vehicle if he or she commits theft of a motor vehicle.
> (2) Theft of a motor vehicle is a class B felony.

Even if a riding lawnmower does not constitute a motor vehicle for purposes of RCW 9A.56.065, Joshua Barnes committed a crime by taking the lawnmower. Assuming the lawnmower had a value of between $750.01 and $5,000.00, Barnes' conduct constituted theft in the second degree, a class C felony. RCW 9A.56.040. Presumably the State charges Barnes with theft of a motor vehicle since it constitutes a higher level of crime, a class B felony.

The Washington Legislature enacted RCW 9A.56.065 in 2007. The bill responded to rising automobile thefts on the nation's west coast, and the enactment contained extensive findings. These findings explore the purposes behind the 2007 law. We consider these findings important to our decision. LAWS OF 2007, ch. 199, § 1 declares, in part:

> AN ACT Relating to *auto* theft; . . . Be it enacted by the Legislature of the State of Washington: NEW SECTION. Sec. 1. (1) The legislature finds that:
> (a) *Automobiles* are an essential part of our everyday lives. The west coast is the only region of the United States with an increase of over three percent in *motor vehicle* thefts over the last several years. The family *car* is a priority of most individuals and families. The family *car* is typically the second largest investment a person has next to the home, so when a *car* is stolen, it causes a significant loss and inconvenience to people, imposes

4

financial hardship, and negatively impacts their work, school, and personal activities. Appropriate and meaningful penalties that are proportionate to the crime committed must be imposed on those who steal *motor vehicles*;

(b) In Washington, more than one *car* is stolen every eleven minutes, one hundred thirty-eight *cars* are stolen every day, someone's *car* has a one in one hundred seventy-nine chance of being stolen, and more *vehicles* were stolen in 2005 than in any other previous year. Since 1994, *auto* theft has increased over fifty-five percent, while other property crimes like burglary are on the decline or holding steady. The national crime insurance bureau reports that Seattle and Tacoma ranked in the top ten places for the most *auto* thefts, ninth and tenth respectively, in 2004. In 2005, over fifty thousand *auto* thefts were reported costing Washington citizens more than three hundred twenty-five million dollars in higher insurance rates and lost *vehicles*. Nearly eighty percent of these crimes occurred in the central Puget Sound region consisting of the heavily populated areas of King, Pierce, and Snohomish counties;

(c) Law enforcement has determined that *auto* theft, along with all the grief it causes the immediate victims, is linked more and more to offenders engaged in other crimes. Many stolen *vehicles* are used by criminals involved in such crimes as robbery, burglary, and assault. In addition, many people who are stopped in stolen *vehicles* are found to possess the personal identification of other persons, or to possess methamphetamine, precursors to methamphetamine, or equipment used to cook methamphetamine; . . . . and

(e) A coordinated and concentrated enforcement mechanism is critical to an effective statewide offensive against motor vehicle theft. Such a system provides for better communications between and among law enforcement agencies, more efficient implementation of efforts to discover, track, and arrest auto thieves, quicker recovery, and the return of stolen *vehicles*, saving millions of dollars in potential loss to victims and their insurers.

(Emphasis added.) Note that the findings interchangeably use the nouns "auto,"

"automobile," "motor vehicle," "car," and "vehicle."

Our sole task is determining whether a riding lawnmower is a "motor vehicle"

5

under RCW 9A.56.065. The legislature holds the prerogative of defining and classifying crimes. Therefore, our fundamental purpose in construing a criminal statute is to ascertain and carry out the intent of the legislature. *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011).

Washington follows the plain meaning rule. To determine legislative intent, this court looks first to the language of the statute. *Lacey Nursing v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). If the statute's meaning is plain on its face, the court will give effect to that plain meaning as the expression of what was intended. *Tracfone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 281, 242 P.3d 810 (2010). Unambiguous language must be applied as written. *State v. Smith*, 117 Wn.2d 263, 270-71, 814 P.2d 652 (1991). When the statute is clear, courts may not engage in statutory construction. *State v. Hahn*, 83 Wn. App. 825, 832, 924 P.2d 392 (1996). Plain words do not require construction. *City of Kent v. Jenkins*, 99 Wn. App. 287, 290, 992 P.2d 1045 (2000). We assume the legislature means what it says. *Vance v. XXXL Dev., LLC*, 150 Wn. App. 39, 41, 206 P.3d 679 (2009). Only if the language of the statute gives rise to two reasonable interpretations, will the court look outside the language of the statute and employ rules of construction. *Cerrillo v. Esparza*, 158 Wn.2d 194, 203-04, 142 P.3d 155 (2006).

Under the plain meaning rule, Washington courts may look to other language in

the same statute and even language in other statutes. In Washington, courts determine the plain meaning of a statute's language by simultaneously examining the language of the entire statute and related statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10-12, 43 P.3d 4 (2002); *In re Estate of Lyons*, 83 Wn.2d 105, 108, 515 P.2d 1293 (1973); *CJC v. Corp. of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 708-09, 985 P.2d 262 (1999). A court deciphers meaning based on the context of all statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d at 10.

RCW 9A.56.065 does not define our key phrase: "motor vehicle." Nor does the criminal code, Title 9 RCW, define the term. RCW 9A.04.110, the criminal code's definitional section, defines the narrower term "vehicle." RCW 9A.04.110(29) reads:

> "Vehicle" means a "motor vehicle" as defined in the vehicle and traffic laws, any aircraft, or any vessel equipped for propulsion by mechanical means or by sail.

So RCW 9A.04.110(29) returns us to the phrase "motor vehicle" and directs us to the vehicle and traffic laws found in Title 46 RCW, incidentally the "motor vehicle" code. This court has already ruled that we should interpret the definition of "motor vehicle," for purposes of Title 9A, by reviewing Title 46. *State v. Acevedo*, 159 Wn. App. 221, 228-29, 248 P.3d 526 (2010); *State v. McGary*, 37 Wn. App. 856, 858, 683 P.2d 1125 (1984). Title 46 RCW contains definitions for "motor vehicle," "vehicle," and "highway."

RCW 46.04.320 defines "motor vehicle:"

7

"Motor vehicle" means *every vehicle* that is *self-propelled* and every vehicle that is propelled by electric power obtained from overhead trolley wires, but not operated upon rails. . . . *An electric personal assistive mobility device is not considered a motor vehicle. A power wheelchair is not considered a motor vehicle. A golf cart is not considered a motor vehicle*, except for the purposes of chapter 46.61 RCW.

(Emphasis added.) RCW 46.04.670 defines "vehicle:"

"Vehicle" includes *every device capable of being moved upon a public highway and in, upon, or by which any persons or property is or may be transported or drawn upon a public highway*, including bicycles. *"Vehicle" does not include power wheelchairs* or devices other than bicycles moved by human or animal power or used exclusively upon stationary rails or tracks. *Mopeds are not considered vehicles or motor vehicles for the purposes of chapter 46.70 RCW. Bicycles are not considered vehicles for the purposes of chapter 46.12, 46.16A, or 46.70 RCW or RCW 82.12.045. Electric personal assistive mobility devices are not considered vehicles or motor vehicles for the purposes of chapter 46.12, 46.16A, 46.29, 46.37, or 46.70 RCW. A golf cart is not considered a vehicle, except for the purposes of chapter 46.61 RCW.*

(Emphasis added.) RCW 46.04.197 defines "highway:"

"Highway" means the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel.

Under Title 46 RCW definitions, a "motor vehicle" means a self-propelled device capable of transporting people or property on a public highway. A riding lawnmower is self-propelled by a gasoline engine. A riding lawnmower is rarely found on a public street and is intended only for use on a lawn. Nevertheless, a riding lawnmower is capable of transporting a person or property on a road. Therefore, a riding lawnmower

8

meets the elements of "motor vehicle." If we read RCW 46.04.320 and .670 literally, a riding lawnmower is a motor vehicle.

Note that RCW 46.04.320 and .670 contain express exceptions to the term "motor vehicle." A riding lawnmower is not one of those exclusions. The failure to list a riding lawnmower as an exception is some evidence that the legislature wanted the lawnmower included within the definition of a motor vehicle. In *Goldstein v. Grinnell Select Insurance Co.*, 2016 IL. App (1st) 140317, ¶¶ 33-35, ___ N.E.3d ___ (2016), the court held that a riding lawnmower was a "motor vehicle" under an Illinois statute because the legislature did not exempt a lawnmower from the definition of the term.

The State argues that no interpretation or construction of RCW 46.04.320's definition of "motor vehicle" is necessary. Use of the word "every" in RCW 46.04.320 and .670, according to the State, confirms a legislative intent for a broad reading of the term. A riding lawnmower is not listed as an exception. Joshua Barnes has failed to identify any ambiguous words or phrases in the definitions found in RCW 46.04.320 and .670. Therefore, the State argues that, under the plain meaning rule, we should not engage in interpretation. We disagree.

We question, for at least two reasons, whether we should always follow the plain meaning principle. First, the state legislature sometimes ineptly expresses its intent. Our Supreme Court has recognized that the legislature sometimes uses inept language. *State*

9

*v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981). If we took the plain meaning rule as an unyielding rule, we might slavishly follow the language of a statute despite knowing the legislature intended a different result. We would then not fulfill our fundamental goal of following the intent of the legislature. We would violate the separation of powers doctrine since we would knowingly thwart the desire of the legislative branch in service to a court created rule.

Second, language can never adequately and comprehensively express the speaker's message or intent. If there can never be perfect human communication, language to some degree is always inept. If the legislature wanted to precisely and thoroughly express its objective, each enactment would comprise a book so as to identify the one and only meaning intended for each word in the statute, particularly with regard to words that have multiple meanings. The book would need to compile all of the examples intended to fall under the respective terms in the statute and intended to fall outside each term. Ludwig Wittgenstein's friend would need to instruct Wittgenstein for minutes, if not hours, as to the types of games he did not wish Wittgenstein to teach children. Although the friend could instruct Wittgenstein only to teach age appropriate games, the friend and Wittgenstein could disagree as to age appropriate games.

Apparently the plain language rule may be skirted. One critical principle of statutory interpretation and the principle on which we base our decision is a statute

10

should be construed in light of the legislative purposes behind its enactment. *State v. Day*, 96 Wn.2d at 648 (1981). The spirit or purpose of an enactment should prevail over the express but inept wording. *State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992). Even if a court determines that the statute's meaning is not ambiguous, the court should still construe the statute to affect its purpose, and any unlikely, absurd, or strained consequences resulting from a plain and literal reading of the statute should be avoided. *State v. McDougal*, 120 Wn.2d 334, 350, 841 P.2d 1232 (1992); *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990). In such circumstances, when the literal expression is inconsistent with the legislature's obvious objectives or policy, the spirit or intention of the law must prevail over the letter of the law. *Janovich v. Herron*, 91 Wn.2d 767, 772, 592 P.2d 1096 (1979); *State v. Brasel*, 28 Wn. App. 303, 309, 623 P.2d 696 (1981). A thing within the letter of the law, but not within its spirit, may be held inoperative when it would otherwise lead to an absurd conclusion. *Murphy v. Campbell Inv. Co.*, 79 Wn.2d 417, 421, 486 P.2d 1080 (1971).

As argued by Joshua Barnes, a literal reading of RCW 46.04.320 and its definition of "motor vehicle" would lead to unintended and silly results. An iRobot Roomba, a self-propelled vacuum, would be a motor vehicle, since one could transport small property on the Roomba. A jokester could place her cat on top of the vacuum and send the iRobot Roomba down her neighborhood street. Theft of a child's remote control car that

11

includes a doll in the driver's seat would also qualify for theft of a motor vehicle if we literally read RCW 46.04.320 and .670. Therefore, the purposes behind RCW 9A.56.065 should assist in limiting a literal meaning of the "motor vehicle" definition.

The Washington Legislature's findings adopted when enacting RCW 9A.56.065 show that the legislature did not consider a riding lawnmower to be a motor vehicle for purposes of the theft statute. The legislature adopted the 2007 statute because of a rash of automobile thefts and because of the importance of a car in our mobile society. A riding lawnmower does not constitute essential family transportation. Purchase of the lawnmower is not a huge investment. We are unaware of a significant rise in the theft of riding lawnmowers. The statute's findings interchangeably used the nouns "auto," "automobile," "motor vehicle," "car," and "vehicle," suggesting the legislature only intended to encompass automobiles, or at least transportation designed for public roads.

Decisional law also assists in answering the issue on appeal. In *Peterson v. King County*, 199 Wash. 106, 110, 90 P.2d 729 (1939), the Supreme Court held a road grader to be a motor vehicle under an earlier statute that defined a motor vehicle, in part, as "all vehicles or machines propelled by any power other than muscular, used upon the public highways for the transportation of persons, freight, produce, or any commodity." The court observed that the grader was built and equipped in many respects like heavy duty trucks and was intended to be operated on highways in going and returning from places

12

where it was employed in the task of grading.

*The Straight Story* (Walt Disney Pictures), a critically acclaimed 1999 film, tells the true story of Alvin Straight's 1994 240-mile journey across Iowa and Wisconsin on a riding lawnmower in order to make amends with his brother before his brother's impending death. Straight could not obtain a driver's license because of impaired legs and eyesight. Nevertheless, despite Straight's moving story, a riding lawnmower is built for clipping grass, not for public highway use. The lawnmower's use does not require a license to operate, and the mower need not be registered as a vehicle. One generally tows a lawnmower in a trailer behind a motor vehicle when wanting to transport the lawnmower from worksite to site. Joshua Barnes did not drive Judy Fraker's riding lawnmower on a public street, but instead sought to transport it in the bed of a pickup.

Many foreign decisions address whether a riding lawnmower is a motor vehicle under various circumstances. In at least two cases, courts have held a riding lawnmower to be a motor vehicle for particular purposes. *Goldstein v. Grinnell Select Insurance Co.*, 2016 IL. App (1st) 140317 ¶¶ 33-35; *Stonger v. Riggs*, 85 S.W.3d 703 (Mo. Ct. App. 2002). Other persuasive cases disagree.

In *Lee v. Mowett Sales Co.*, 76 N.C. App. 556, 334 S.E.2d 250 (1985), *aff'd*, 316 N.C. 489, 342 S.E.2d 882 (1986), a child sued a parent for injuries sustained from the blade of a riding lawnmower driven by her father. A North Carolina statute removed a

13

parent's immunity from actions brought by a child arising out of the "operation of a motor vehicle." The statute did not define "motor vehicle," but the court held a riding lawnmower not to be a motor vehicle.

In *Deere & Co. v. Ford*, 434 Mass. 223, 747 N.E.2d 1208 (2001), the court addressed whether its state's statutory scheme regulating the relationship between motor vehicle manufacturers and dealers applied to the relationship between Deere and one of its franchisees. Deere manufactured riding lawnmowers and other lawn equipment. The regulations applied if Deere manufactured "motor vehicles." The statutory scheme defined "motor vehicle" as:

> All vehicles constructed and designed for propulsion by power other than muscular power . . . except . . . vehicles used for other purposes than the transportation of property and incapable of being driven at a speed exceeding twelve miles per hour and which are used exclusively for the building, repair and maintenance of highways or designed especially for use elsewhere than on the travelled part of ways.

*Deere & Co. v. Ford*, 434 Mass. at 226 n.4. The trial court found that some of Deere's riding lawnmower models traveled in excess of twelve miles per hour and thus the exception did not apply. Therefore, the trial court denied Deere summary judgment on the question of whether the regulations applied. The reviewing court reversed. The court concluded that the trial court took the language of the statute too literally. The court looked at the purpose behind the motor vehicle dealer act and concluded that the act should apply only to vehicles designed for regular use on the traveled part of public

14

highways.

A case involving a similar criminal statute is *Harris v. State*, 286 Ga. 245, 686 S.E.2d 777 (2009). A Georgia statute punished one for the theft of a "motor vehicle." Franklin Harris stole a Toro riding lawnmower worth more than $500. A second Georgia statute defined a "motor vehicle" as "any device or vehicle including automobiles, motorcycles, motor trucks, trailers, and all other vehicles operated over the public highways and streets of this state and propelled by power other than muscular power but does not include traction engines, road rollers, implements of husbandry and other agricultural equipment." *Harris v. State*, 686 S.E.2d at 779 n.1. Nevertheless, the court held the riding lawnmower not to be a motor vehicle. A riding lawnmower was capable of transporting people or property and of driving on the street for short stretches. Nevertheless, the lawnmower is not designed for street use since streets contain little grass to mow. Although exceptions to the definition did not include riding lawnmowers, the state legislature recognized that some vehicles that are self-propelled were not meant to fall under the meaning of "motor vehicle." In a compelling passage that addresses the purpose behind motor vehicle theft statutes, the Georgia court wrote:

> What most distinguishes the theft of a "motor vehicle" from the theft of other property is not its value or its ability to be easily escaped *with*, as many items are more valuable or more easily loaded into the back of a van and driven away. What makes motor vehicles, as that term is properly understood, most worthy of specialized treatment is that they are an unusual type of personal property which, once stolen, can be readily escaped *in*. A thief can steal and escape quickly in an automobile, a motorcycle, a truck,

15

or even a four-wheeler, but not on a riding lawnmower, asphalt spreader, or skid steer.

*Harris v. State*, 686 S.E.2d at 781 (2009).

The purposes of criminal statutory construction, codified as RCW 9A.04.020, also aids in our interpretation of RCW 9A.56.065's and RCW 46.04.320's use of the term "motor vehicle." The first statute reads, in relevant part:

> (1) The general purposes of the provisions governing the definition of offenses are:
> . . . .
> (d) To differentiate on reasonable grounds between serious and minor offenses, and to prescribe proportionate penalties for each.
> (2) The provisions of this title shall be construed according to the fair import of their terms but when the language is susceptible of differing constructions it shall be interpreted to further the general purposes stated in this title.

RCW 9A.04.020.

Theft of a motor vehicle carries a potential sentence that is twice as long as standard theft, meaning theft of a lawnmower, Segway, or iRobot Roomba could be treated the same as theft of a Ferrari. This result conflicts with the fourth purpose of Title 9A RCW, "[t]o differentiate on reasonable grounds between serious and minor offenses, and to prescribe proportionate penalties for each." RCW 9A.04.020(1)(d).

We find support in *State v. Day*, 96 Wn.2d 646 (1981), for avoiding the plain language of the definition of "motor vehicle" found in RCW 46.04.320 and .670. The State charged Willie Day with driving while intoxicated. Day drove an unlicensed

16

pickup in rapid circles in a field owned by his parents. He never entered a public road or drove near a public road. Day did not contest that he drove under the influence. The charging statute rendered it "unlawful for any person who is under the influence . . . to drive . . . a vehicle within this state." Former RCW 46.61.506 (1979). As noted by the dissent, the plain language of the statute did not require that the accused drive on a public street or highway. Nevertheless, the Supreme Court reversed Day's conviction. The purpose of the drunk driving law was to reduce drunk driving hazards to highway safety and the traveling public. Day did not pose a threat to the public when driving intoxicated on his parent's land.

Joshua Barnes suggests that we utilize the rule of lenity. We see no need to employ the rule for the benefit of Barnes.

## CONCLUSION

We affirm the superior court's dismissal of charges against Joshua Barnes for theft of a motor vehicle. A riding lawnmower is not a motor vehicle for purposes of theft.

_Fearing, J._

Fearing, C.J.

WE CONCUR:

_Siddoway, J_

Siddoway, J.

_Lawrence-Berrey, J_

Lawrence-Berrey, J.

17